UNITED  STATES  DISTRICT  COURT
SOUTHERN  DISTRICT  OF  OHIO
WESTERN  DIVISION

| | | |
|---|---|---|
| RONDAL IRVIN, | : | Case No. 1:12-cv-837 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| | : | |
| Defendant. | : | |

**ORDER THAT: (1) THE ALJ'S NON-DISABILITY FINDING IS FOUND
SUPPORTED BY SUBSTANTIAL EVIDENCE, AND AFFIRMED;
AND (2) THIS CASE IS CLOSED**

This is a Social Security disability benefits appeal.  At issue is whether the

administrative law judge ("ALJ") erred in finding the Plaintiff "not disabled" and

therefore unentitled to disability insurance benefits ("DIB") and supplemental security

income ("SSI").  (*See* Administrative Transcript ("Tr.") (Tr. 18-31) (ALJ's decision)).

**I.**

Plaintiff originally filed an application for DIB in November 2002, alleging that he

became unable to work in November 2001.  (Tr. 107).  His claim was denied initially and

on reconsideration.  (Tr. 123-26).  In April 2005, the ALJ held a hearing on Plaintiff's

claims.  (Tr. 107).  The ALJ rendered a decision in May 2005, finding that Plaintiff,

despite severe mental and physical impairments, had the residual functional capacity ("RFC")[1] to perform a restricted range of light unskilled work. (Tr. 104-118).

Plaintiff did not appeal the ALJ's decision, but instead in March 2009 filed applications for DIB and SSI, alleging that he became unable to work in November 2001 due to lumbar and cervical degenerative disc disease, anxiety, depression, and borderline intellectual functioning with illiteracy. (Tr. 294-98, 317). Plaintiff later amended his alleged onset date to September 2006. (Tr. 314). The Agency denied his claims initially and on reconsideration. (Tr. 127-32, 137-42). In May 2011, an ALJ held a hearing on Plaintiff's claims. (Tr. 39-92). Plaintiff, two medical experts, and a vocational expert testified, with Plaintiff's attorney in attendance. (*Id*.)

The ALJ rendered an unfavorable decision in May 2011. (Tr. 15-31). After reviewing the medical evidence and citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997) ("When the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances."), the ALJ found there was new and material evidence to support a slightly more restrictive light, unskilled work RFC than the one the ALJ found in his May 2005 findings. (Tr. 18-19, 117).[2] Nevertheless, the ALJ found that even with

---

[1] A claimant's residual functional capacity ("RFC") is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).

[2] *See* Acquiescence Ruling 98-4(6) ("When adjudicating a subsequent disability claim with an unadjudicated period…adjudicators must adopt such a finding from the final decision by an ALJ…with respect to the unadjudicated period unless there is new and material evidence relating to such a finding…").

a slightly more restrictive RFC, there remained a significant number of jobs that Plaintiff could perform, and that he was therefore not disabled.  (Tr. 23, 29-30).  This decision became final and appealable in August 2012, when the Appeals Council denied Plaintiff's request for review.  (Tr. 1-3).  Plaintiff seeks judicial review pursuant to section 205(g) of the Act.  42 U.S.C. §§ 405(g), 1383(c)(3).

At the time of the hearing, Plaintiff was a 45 year old male with a 12th grade education (with special education classes).  (Tr. 75, 322, 414-420).  Plaintiff reported that after high school, he spent three years at Sister Notre Dame School trying to learn how to read.  (Tr. 325).  Despite his efforts, Plaintiff could only read on a second grade level. (*Id.*)  Plaintiff has past relevant work experience as a plumbing installer.[3]  (Tr. 86-87, 318, 327, 408).

The ALJ's "Findings," which represent the rationale of his decision, were as follows:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2007.

2.  The claimant has not engaged in substantial gainful activity since September 1, 2006, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

---

[3]  There was some disagreement over what level of skill Plaintiff's job required, at least as he performed it.  Plaintiff's description of his job duties as a "plumbing installer" was to "load equipment into truck, drop off to job site, operate machinery to dig holes for drains and pipes" (Tr. 318).  The vocational expert who evaluated Plaintiff's claims at the initial level stated that this description most closely matched the DOT title of "Construction Worker II."  DOT 869.687.

3. The claimant has the following severe impairments: degenerative disc disease; left groin strain; borderline intellectual functioning; personality disorder; and anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except occasionally lift 20 pounds; frequently lift ten pounds; push or pull to the same extent using hand or foot controls; stand or walk six hours with walking limited to 30 minutes at a time; and sit six hours in an eight-hour work day.  He cannot use ladders, ropes or scaffolds and cannot more than occasionally stoop, bend, or kneel and never crawl.  He should avoid heat and cold extremes and avoid using vibrating tools.  Due to his mental impairments, he can understand and remember simple instructions, sustain attention to completed simple repetitive tasks where production quotas are not critical, tolerate the public, co-workers, and supervisors with limited interpersonal demands in an object-focused work setting, and adapt to routine changes in a simple work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on January 31, 1966 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English.  (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569,

404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2006, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 21-30).

In sum, the ALJ concluded that Plaintiff was not under a disability as defined by the Social Security Regulations, and was therefore not entitled to DIB or SSI. (Tr. 29).

On appeal, Plaintiff argues that: (1) the ALJ erred in finding that Plaintiff's impairments do not meet Listing 1.04A; and (2) the ALJ improperly weighed the medical opinion evidence and disregarded the opinions of Dr. Eric Niemeyer and Dr. Nicole Leisgang. The Court will address each error in turn.

## II.

The Court's inquiry on appeal is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). In performing this review, the Court considers the record as a whole. *Hephner v. Mathews,* 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if substantial evidence also exists in the record upon which the ALJ could have found plaintiff disabled. As the Sixth Circuit has explained:

5

> "The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard presupposes that there is a "zone of choice" within which the Commissioner may proceed without interference from the courts. If the Commissioner's decision is supported by substantial evidence, a reviewing court must affirm."

*Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The claimant bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). That is, he must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job in the national economy. 42 U.S.C. § 423(d)(1)(A).

## A.

The record reflects that:

**Physical Impairments**

Plaintiff was injured in 1995 when he fell from a cherry-picker-type lift which had been at a height of approximately two stories. (Tr. 422). Plaintiff was initially diagnosed with lumbar and dorsal sprains, which were believed to have exacerbated Plaintiff's degenerative disc disease. (*Id.*) A lumbar MRI from January 1996 revealed a disc protrusion at L5-S1 which made contact with his S1 nerve roots. (Tr. 423, 429). After being diagnosed, Plaintiff spent a year participating in physical therapy and undergoing therapeutic steroid injections and evaluations by multiple physicians at the request of the

Bureau of Workers' Compensation, but Plaintiff was unable to obtain significant relief from his pain. (Tr. 421-424, 425-427, 428-429, 430-431, 432-436, 483-485, 645-707, 713-720). For example, on September 17, 1996, Dr. Amendt performed an independent medical examination and concluded that Plaintiff was incapable of returning to his former work and was limited to light exertion. (Tr. 424).

In the following years, Plaintiff continued to experience back and neck pain, but he still tried to work. (Tr. 426, 429). In late 2001, Plaintiff re-injured his back while lifting a heavy pipe at a work site. (Tr. 432). This caused further pain in his back which, over time, began to radiate down into his left hip and leg. (Tr. 437). Plaintiff treated regularly with Daniel Sway, M.D., from 2006 to February 2008 for his degenerative disc disease and related conditions. (Tr. 442-482). Dr. Sway added the diagnoses of spinal stenosis and lumbar spondylosis to Plaintiff's previously diagnosed degenerative disc disease. (Tr. 447). Dr. Sway also diagnosed Plaintiff with anxiety disorder and sleep dysfunction. (Tr. 477).

In 2008, Plaintiff's left leg gave out, causing him to fall down a set of stairs. (Tr. 483). This caused pain in Plaintiff's neck and left upper extremity, and also exacerbated his back pain. (Tr. 437, 483-484). Plaintiff had a lumbar MRI on April 30, 2008, which revealed a disc protrusion at L5-S1 which contacted the right L5 and S1 proximal nerve roots, disc bulging at L3-4 and L4-5 with mild lower lumbar degenerative facet arthropathy which resulted in bilateral neural foraminal stenosis, and congenital short

7

pedicles and ligamentum flavum hypertrophy which contributed to mild central canal stenosis at L4-5 and L5-S1.  (Tr. 483-484, 699-701).

Plaintiff began treatment at University Family Physicians in March 2009; his primary physician there was Dr. Niemeyer.  (Tr. 507-511, 546-557, 558-563, 566-597). At his initial visit, Plaintiff reported to Dr. Niemeyer that he had a great deal of lower back and left leg pain along with numbness and tingling in his left arm.  (Tr. 508). Plaintiff visited Dr. Niemeyer on a regular basis throughout 2009, and was treated for chronic pain, allergies, hyperlipidemia, and an interest in quitting smoking.  (Tr. 546-557).  Dr. Niemeyer refilled Plaintiff's medications until Plaintiff could find a pain management physician.  (*Id.*)  On June 25, 2009, Dr. Niemeyer completed a Physical RFC questionnaire, in which he opined that due to Plaintiff's chronic neck and low back pain and weakness and neuropathy of his lower extremity, Plaintiff was capable of only standing and/or walking two hours in an eight-hour workday, and sitting only four hours in an eight-hour workday, and he would require permission to shift positions at will.  (Tr. 560-565).  He cited to objective findings which included muscle spasms in Plaintiff's low back and lower extremity weakness.  (Tr. 559).  Dr. Niemeyer opined that Plaintiff should only occasionally lift or carry ten pounds, lift or carry fewer than ten pounds at a frequency somewhere between occasional and frequent, and that he should never lift or carry more than ten pounds.  (*Id.*)  Dr. Niemeyer opined that Plaintiff would be absent from work approximately three days per month.  (*Id.*)

While treating with a chiropractor in 2008, Plaintiff was referred to a neurologist, Dr. Colin Zadikoff, for a more detailed diagnostic evaluation of cervical spine pain and left upper extremity pain which had more recently developed. (Tr. 660-663). Dr. Zadikoff also reviewed Plaintiff's 2008 lumbar MRI, and confirmed the herniated disc on the left at L5-S1. (Tr. 660). Upon examination, Dr. Zadikoff observed that Plaintiff had an absent left ankle jerk response, an antalgic gait, and paraspinal muscle spasm. (Tr. 661). Dr. Zadikoff stated that he did not have a cervical MRI scan to review, but he opined that Plaintiff has cervical radicular pain and most likely had a cervical herniated disc. (Tr. 662). He observed that Plaintiff had attempted numerous types of conservative treatment over the years, without much success, and Dr. Zadikoff concluded that "he might benefit from definitive treatment and he does have a herniated disc at L5-S1, so it is possible that surgical correction of that disc could be of benefit." (*Id.*)

Despite the additional treatment from Dr. Niemeyer and others at University Family Physicians, Plaintiff continued to suffer from neck pain and chronic back pain accompanied by lower extremity weakness and nerve pain into 2010. (Tr. 566-597). In September 2009, Dr. Holiday at University Family Physicians began treating Plaintiff for depression. (Tr. 572-587). In October 2010, Plaintiff developed an infected wound in his right palm, which was severe enough to require hospitalization and an "incision and drainage" procedure. (Tr. 601-631). Plaintiff followed up with an orthopedist at University Hospital Clinics. (Tr. 599-600, 632-635; Tr. 728-753, 754-759, 767-777).

9

On March 2, 2010, Plaintiff had another lumbar MRI which revealed diffuse disc disease throughout his spine, including possible annular fissures in the disc at L2-3, and also revealed a worsening in the condition of the disc at L5-S1, which had a broad-based left central and preforaminal disc herniation causing compression of the left S1 nerve root, along with mild thecal sac narrowing, measuring 8 mm in the AP dimension, and relative narrowing of the right subarticular region and borderline to mild compression of the right S1 nerve root could not be excluded by the radiologist. (Tr. 567-568).

Overall, the record demonstrates a consistent history of Plaintiff's objective findings which depict the severity of his degenerative disc disease, including positive straight leg raise tests on the left (Tr. 434, 462, 803), with possibly positive straight leg raise on the left (Tr. 437, 694), reduced strength and reflexes on the left (Tr. 485, 573, 656, 661, 686), and loss of sensation in his left lower extremity (Tr. 434,437, 485, 573, 656, 694). Plaintiff has also demonstrated antalgic gait (Tr. 661, 686), spasm in his lumbar paraspinal muscles (Tr. 498, 661, 677, 679, 681, 686), reduced range of motion of his lumbar spine (Tr. 425-426, 429, 434, 465, 485, 668, 714), reduced range of motion in his lower extremities (Tr. 718), and tenderness to palpation in his lumbar spine (Tr. 424, 425, 434, 437, 462, 465, 498, 504, 571, 573, 579, 593, 668, 694, 695, 772, 803).

**Psychological Impairments**

On April 8, 2009, Plaintiff underwent a psychological consultative evaluation performed by Nicole Leisgang, Psy.D. (Tr. 512-519). Plaintiff reported seeking disability compensation because he is unable to read and write, because he is easily

distracted and forgetful, because he has restlessness, impulsivity, and irritability, and because he has continual depression, which causes withdrawal from others, anhedonia,[4] irritability, and anxiety. (Tr. 512). Plaintiff also described his physical impairments, which included continual neck and back pain. (*Id.*) Plaintiff explained that he did poorly in school, even with the benefit of special education classes, and that he was suspended from school "plenty of times" for skipping school and fighting. (Tr. 513). He reported a history of criminal charges related to drugs and alcohol, but he did not spend any time in prison. (*Id.*) Plaintiff told Dr. Leisgang that he had worked at approximately 13 jobs, with his longest period of employment being for one year, and that he had been fired from jobs in the past. (*Id.*) During the mental status examination, Dr. Leisgang observed that Plaintiff was cooperative, but he appeared to be anxious (since he fidgeted with his hands, maintained fleeting eye contact, bounced his legs, and sighed repeatedly as if to calm himself) and somewhat irritable (as he displayed a scowl-like facial expression and provided often curt and flippant responses during psychometric testing). (Tr. 514). Dr. Leisgang observed that Plaintiff was preoccupied with his difficulties and she found that his complaints of pain could be indicative of somatization.[5] (*Id.*)

---

[4] Anhedonia is a psychological condition characterized by the inability to experience pleasure in acts which normally produce it.

[5] Individuals with somatization disorder suffer from a number of vague physical symptoms, involving at least four different physical functions or parts of the body. The physical symptoms that characterize somatization disorder cannot be attributed to medical conditions or to the use of drugs, and individuals with somatization disorder often undergo numerous medical tests (with negative results) before the psychological cause of their distress is identified.

On psychometric testing, Plaintiff's remote recall was adequate, but his short-term memory abilities were weak, as he could recall three digits forward and only two digits backward. (Tr. 515). Plaintiff's attention and concentration were not strong, as was demonstrated by the fact that he could not correctly calculate serial sevens,[6] and his arithmetic reasoning abilities were limited, as demonstrated by his inability to correctly subtract two-digit numbers, and his abstract reasoning skills were very limited. (*Id.*) Dr. Leisgang administered the WAIS-IV in order to measure Plaintiff's IQ. (*Id.*) Plaintiff obtained a Verbal Comprehension Index of 66, a Perceptual Reasoning Index of 73, and a Full Scale IQ of 64, in part due to a Working Memory Index of only 63. (*Id.*) She determined that the discrepancy between the Verbal Comprehension and Perceptual Reasoning scores was not unusually large, and that the scatter on the subtest scores fell within acceptable limits. (*Id.*) Dr. Leisgang noted that Plaintiff's short-term memory skills fell well below average limits and his word reasoning abilities and fund of information fall moderately below average limits. (Tr. 516). Dr. Leisgang commented that Plaintiff's tested IQ was lower than would be expected given his clinical presentation, but she did not state that the IQ scores were invalid. (*Id.*) School records confirm that Plaintiff has learning disabilities in reading, writing, and math (each at a 2nd to 3rd grade level) which undoubtedly restrict his ability to work. (Tr. 414).

---

[6] Serial sevens, counting down from one hundred by sevens, is a clinical test used to test mental function. On its own, the inability to perform "serial sevens" is not diagnostic of any particular disorder or impairment, but is generally used as a quick and easy test of concentration and memory in any number of situations where clinicians suspect that these cognitive functions might be affected.

Dr. Leisgang diagnosed Plaintiff with Depressive Disorder, NOS; Anxiety Disorder, NOS; and Personality Disorder, NOS, and she assigned a GAF score of 55.[7] (Tr. 517). She opined that Plaintiff would have moderate impairments in his ability to relate to others, including coworkers and supervisors, and may have some difficulty relating to others even in completing simple repetitive tasks; his mental ability to understand, remember, and follow simple instructions; in his ability to maintain attention, concentration, persistence, and pace and that ability may deteriorate over extended time periods, slowing his performance in completing simple repetitive tasks; and in his mental ability to withstand the stress and pressure of day to day work activity, such that it could slow his work performance or that his symptoms of anxiety and depression may be increased. (Tr. 517).

**Opinions of Reviewing Physicians and Psychologists**

A number of physicians provided their medical opinions after reviewing portions of the medical records. For example, in April 2009, the state-agency reviewing psychologists opined that Plaintiff would have only moderate psychological work-related limitations. (Tr. 520-533, 534-537). In May 2009, a state-agency reviewing physician opined that Plaintiff was capable of a slightly reduced range of medium exertion. (Tr. 538-545). In late August and early September 2009, another set of state-agency

---

[7] The Global Assessment of Functioning ("GAF") is a numeric scale (0 through 100) used by mental health clinicians and physicians to rate subjectively the social, occupational, and psychological functioning of adults, *e.g.*, how well or adaptively one is meeting various problems-in-living. A score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

reviewing physicians reviewed the opinions of the earlier physicians and simply affirmed the initial opinions. (Tr. 564-565).

In January 2011, Dr. Laura Rosch, a consulting physician, and Dr. George Rogers, Jr., a consulting psychologist, were asked by the ALJ to provide their opinions by answering a set of interrogatories which the ALJ sent to them. (Tr. 636-638, 639-644). In April 2011, the ALJ sent another set of interrogatories to Dr. Rosch and a set to Dr. Rubini. (Tr. 760-763, 764-766). Dr. Rogers also completed another set of medical interrogatories on April 21, 2011. (Tr. 778-783). In each set of interrogatories, the physicians provided only a cursory explanation for their opinions, and cited only very generally to the exhibits. (*Id.*)

**Hearing Testimony**

**A. Plaintiff's Testimony**

At the hearing on May 3, 2011, Plaintiff testified that he experiences back pain which radiates down his left leg. (Tr. 51). Plaintiff explained that he attempted physical therapy and subjected himself to epidural steroid injections to try to alleviate the pain in his back. (Tr. 52). Doctors have recommended surgery, but the surgeon who Plaintiff consulted hesitated to operate, fearing that it could worsen his conditions. (Tr. 53).

Plaintiff's neck and back pain began around the time of his work-related injury in 1995. (Tr. 59). The pain moves from his neck and back and goes into his arms, causing an "electrical shock" type of pain in his left arm. (*Id.*) This pain limits Plaintiff's ability to do simple things, such as household cleaning, reaching up above his head, twisting his

14

torso, and rising up from being on his hands and knees. (Tr. 59-60). Plaintiff explained that lifting anything heavier than a half-gallon of milk increases his back pain. (Tr. 60).

Plaintiff testified that he re-injured his back in March 2010 while he was moving around some boxes at his brother's house. (Tr. 76). In that same year, Plaintiff flew to California to visit his sister for Thanksgiving. (Tr. 81). However, Plaintiff was not particularly active during this trip, as he mostly stayed at his sister's home, and his routine was similar to his routine at home. (*Id*.)

On April 28, 2011, Plaintiff began visiting Dr. Hill because his legs were going numb and his back pain was flaring up, making it difficult for him to move around and function. (Tr. 53-54). Plaintiff testified that he has used a cane for approximately three years, which was prescribed by one of his physicians. (Tr. 54). Plaintiff uses his cane whenever he is walking or shopping because his left leg is prone to give out. (*Id*.) Plaintiff estimated that his left leg had given out approximately four times in the three months prior to the hearing. (Tr. 55).

Plaintiff estimated that he can stand for only fifteen or twenty minutes at a time, walk for only fifteen minutes at a time, which he equated to being approximately four blocks. (Tr. 69). Plaintiff opined that in a day's time, he could probably walk a mile. (Tr. 70). His limitations include how long he is able to sit; Plaintiff estimated that the longest he can sit without getting up is one-half hour. (*Id*.) Plaintiff also has difficulty ascending and descending stairs because his left leg gives out on him without warning. (Tr. 71).

Plaintiff testified that he gets migraines about twice a month, each lasting two days.  (Tr. 61).  He has trouble falling asleep and when he is finally able to go to sleep, he wakes up every two hours throughout the night.  (Tr. 62).  In the past, Plaintiff has taken medication for his sleep dysfunction, which was somewhat helpful.  (Tr. 63).  Plaintiff admitted that he has struggled with marijuana use, cocaine use, and alcohol abuse in the past.  (Tr. 68, 78).  However, he stated that he has not ingested cocaine or marijuana in a year, and that he no longer abuses alcohol, as he drinks only occasionally.  (Tr. 68, 79).

Plaintiff was in special education classes throughout high school, and he testified that he does not read or write very well.  (Tr. 58).  In fact, Plaintiff acknowledged that he would not be able to understand a newspaper if he were to read it, and that he is not able to fill out a job application by himself.  (*Id.*)  Plaintiff has had memory problems for approximately five years.  (Tr. 55-56).  He often forgets appointments, dinner plans, past events, phone numbers, and birth dates.  (Tr. 56).  It is bad enough that he has spoken with a mental health professional about the issue.  (*Id.*)  Plaintiff has a friend who stops by on a near daily basis to check on him, and writes things down to help him remember. (Tr. 57).

Plaintiff testified that he suffers from depression and anxiety which began in 1995, after he was first injured, and which developed as a response to his chronic pain.  (Tr. 64).  Plaintiff explained that he has anxiety attacks, which he must treat by breathing into a brown paper bag.  (*Id.*)  His panic attacks used to occur as frequently as once every two months, but now occur only two or three times a year.  (*Id.*)  Plaintiff's depression

adversely affects his eating habits, the amount of time he spends with his friends, and his ability to be in a crowded place. (Tr. 65-66). Plaintiff testified that he has always had a problem with attention and concentration. (Tr. 66). He also testified that he does not deal well with stress, and that he will "blow up" in stressful situations due to the uncontrollable anger that builds up. (Tr. 67). Plaintiff testified that what most prevents him from working are his depression and his back problems. (Tr. 68).

**B. Testimony of Medical and Vocational Experts**

The ALJ first called upon Dr. Joseph Rubini, an internist, to testify. (Tr. 43). The ALJ simply asked Dr. Rubini whether he had reviewed the complete exhibit file, and whether the new medical records gave him any reason to alter the opinion he rendered in the answers to interrogatories at Exhibit B32F. (Tr. 44). Dr. Rubini stated that he had no changes to those answers. (*Id.*) Dr. Rubini admitted that there were parts of the record which documented positive objective findings of back pain, such as changes in sensation of the lower extremities or reduced reflexes, but he stated that the record "was not consistent for that person [Plaintiff]." (Tr. 44-45). Dr. Rubini also admitted that the record includes objective signs of Plaintiff's cervical degenerative disc disease, but he claimed that the findings were not consistent or persistent enough within the record for him to consider it "severe." (Tr. 45). Dr. Rubini was not able to cite to any specific exhibits to support his claim, but instead relied on the record as a whole. (Tr. 45-46).

Dr. Rogers, a licensed psychologist, testified next. (Tr. 46). The ALJ also asked Dr. Rogers whether he wanted to make any changes to the interrogatory answers he had

17

submitted at Exhibits B25F and B35F.  (Tr. 46-47).  Dr. Rogers stated that he had

reviewed the record through Exhibit B35F and did not see the need to make any changes

to his written opinion.  (Tr. 47).  On cross-examination, Dr. Rogers asserted that the

grade school records "negate" Dr. Leisgang's findings about Plaintiff's IQ scores.  (Tr.

47).  While Dr. Rogers admitted that the IQ scores reported in the school records were

obtained when Plaintiff was 15 years old (or possibly younger), he stated that he was not

aware of the portion of the Social Security Administration's Listing of Impairments

which states that IQ scores are not static until after age 16, and he was not certain if he

agreed with it.  (Tr. 48).  Dr. Rogers testified that he believed Plaintiff's presentation at

Dr. Leisgang's examination demonstrated that Plaintiff's true IQ was somewhat higher

than what the scores in Dr. Leisgang's report reflect.  (Tr. 48-49).  Dr. Rogers had written

in his interrogatory responses that the depression and anxiety might have been substance-

induced (Tr. 780), but when pressed further upon this issue, he admitted there is nothing

in the records which supports the idea that Plaintiff's depression or anxiety are substance-

induced.  (Tr. 50-51).  In addition, Dr. Rogers admitted that there is nothing in the

records to indicate that Plaintiff recently used illegal substances.  (*Id.*)

Vocational Expert William Kiger then testified.  (Tr. 83).  Mr. Kiger began by

stating that he believes Plaintiff's actual educational abilities are at the twelfth grade

level, since that was the farthest grade of school that Plaintiff completed.  (Tr. 85).  He

testified that Plaintiff's only past relevant work was as a plumber.  (Tr. 87).  Mr. Kiger

testified that this line of work is customarily performed at the medium-to-heavy

18

exertional level, but that at times Plaintiff performed it up to the very heavy exertional level. (*Id.*)

In response to the ALJ's hypothetical question, which was based on the medical experts' testimony and answers to interrogatories, Mr. Kiger testified that he did not believe an individual with those capacities could do Plaintiff's past work. (Tr. 87). However, there would be other jobs in the regional and national economy which such a person could perform. (Tr. 88).

Mr. Kiger confirmed that the limitations in Exhibit B17F (the RFC opinion by Dr. Neimeyer) described limitations to part-time work. (Tr. 90). Mr. Kiger also testified that a person who is absent three days per month on a regular basis would not be able to sustain unskilled work. (*Id.*)

**ALJ Decision**

In his decision, the ALJ found that Plaintiff's degenerative disc disease, left groin strain, borderline intellectual functioning, personality disorder, and anxiety disorder are "severe" impairments. (Tr. 21). However, the ALJ found that Plaintiff did not have an impairment or combination of impairments which met or medically equaled a Listing of Impairments, and further found Plaintiff did not have a "severe" mental impairment on or before September 1, 2006. (Tr. 22-23). The ALJ found that Plaintiff has the residual functional capacity for a reduced range of light work. (Tr. 23). The ALJ held that Plaintiff was unable to perform his past relevant work, but found that a significant number of other jobs exist in the region which a person with the RFC he assigned to

Plaintiff could still perform. (Tr. 29). Thus, the ALJ denied Plaintiff's claims for benefits.

**B.**

First, Plaintiff alleges that the ALJ erred in finding that his impairments do not meet Listing 1.04A. Listing 1.04A pertains to disability caused by disorders of the spine and spinal canal. It requires "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)."[8]

For a claimant to show that his impairment matches an impairment in the Listings, he must meet all of the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Additionally, the claimant must prove that the disability lasted for a continuous period of not less than 12 months to meet the Listing. 42 U.S.C. § 423(d)(1)(A). No treating or examining source concluded that Plaintiff met the Listing. While there were occasional findings of "decreased reflexes or changes in sensation of the lower extremities," they "weren't consistent" enough to satisfy a listing.[9] (Tr. 45). *Bailey v.*

---

[8] Unlike Listing 1.04C, Listing 1.04A does not require the "inability to ambulate effectively" or "inability to sustain fine and gross manipulation successfully." *Lombard v. Astrue*, No. 11-cv-10033, 2012 U.S. Dist. LEXIS 33587, at *8-9 (E.D. Mich. Feb. 13, 2012).

[9] Moreover, some of the evidence Plaintiff cites as evidence of Listing 1.04A is redundant or from periods either well before or after the relevant time frame. (*See, e.g.,* Tr. 429, 434, 567-68, 696-97, 803).

*Comm'r of Soc. Sec.*, 413 Fed. Appx. 853, at *2 (6th Cir. 2011) ("To establish the equivalent of nerve-root compression, [Plaintiff] must demonstrate a lack of motor strength, a lack of sensory function, and a positive straight-leg raising test, among other things."). The ALJ relied upon the lack of any specific medical finding in determining that Plaintiff's impairments did not meet all of the required elements of Listing 1.04A. The ALJ's decision is therefore supported by substantial evidence.

## C.

Next, Plaintiff alleges that the ALJ improperly weighed the medical opinion evidence and disregarded the opinions of Dr. Eric Niemeyer and Dr. Nicole Leisgang. Specifically, the ALJ placed great weight on the medical opinions of state agency non-examining physicians but disregarded the treating physicians.

The Regulations clearly state that a treating doctor's opinion must be given "controlling weight" if "well-supported" by objective evidence. 20 C.F.R. § 1527(d)(2). More weight is generally given to treating sources because they can provide a detailed, longitudinal picture of one's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from objective findings alone or from reports of individual examinations such as consultative examinations. *Id.* "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the

treating source – in determining what weight to give the opinion." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 1527(d)(2)).

If an ALJ rejects the opinion of a treating physician, he must articulate clearly "good reasons" for doing so. *Wilson*, 378 F.3d at 544. In order to be "good," those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. In fact, the Sixth Circuit has held that the ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007).

In August 2009, Eric Niemeyer, M.D., who had treated Plaintiff on four occasions from March 2009 to June 2009 (Tr. 508-10, 547-57) completed a Physician RFC Questionnaire. (Tr. 559-63). Dr. Niemeyer opined, among other things, that Plaintiff could stand and/or walk about two hours in an eight-hour workday; could sit about four hours in an eight-hour workday; and could only occasionally lift and carry up to ten pounds. (Tr. 559-63). Dr. Niemeyer also noted that Plaintiff's short-term prognosis was "poor," and that his long-term prognosis was "unknown." (Tr. 559). Four other

physicians opined that Plaintiff could perform at least a restricted range of light work.[10]

Only Dr. Niemeyer, who had seen Plaintiff four times over three months, and was

unwilling to speculate about Plaintiff's long-term prognosis, opined that Plaintiff could

not perform even a range of sedentary work.[11]

      With respect to mental impairments, Plaintiff contends that the ALJ failed to

clarify how much weight he gave to Dr. Leisgang's opinion.  While the ALJ discussed

Dr. Leisgang's evaluation, he never specified what weight he afforded it.  (Tr. 26).

However, it is unclear what actual harm there was in this oversight.  Plaintiff appears to

have no dispute with Dr. Leisgang's opinion that Plaintiff had no more than moderate

limitations in any given area of functioning.  (Tr. 512-18).  Moderate limitations are not

work preclusive and Plaintiff does not contend otherwise.  In fact, although the ALJ

found that Plaintiff was only mildly limited in daily activities, he also found that Plaintiff

was moderately limited in other areas and thus included a number of restrictions in the

mental RFC.  (Tr. 23).  Plaintiff does not contend that the ALJ erred in formulating his

---

[10]  While these opinions were not entirely consistent, they all opinioned that Plaintiff was capable of at least a reduced range of light exertion.

[11]  Despite Plaintiffs argument to the contrary, there is no evidence that the ALJ discounted Dr. Niemeyer's opinion simply because it was not properly identified.  The ALJ noted that the signature, "C. Niemeyer," contained no medical credential, but nevertheless "presumed [the person] to be a medical doctor and a treating source." (Tr. 28).  The ALJ went on to explain that Dr. Niemeyer's assessment was "not fully supported by [his] own notes, and not consistent with the credible portion of activities of daily living evidence."). (*Id.*)

mental RFC.[12]

The Sixth Circuit has held that there are scenarios "where the Commissioner has met the goal of Section 404.1527(d)(2) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation." (*Id.*) *See, e.g., Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 472 (6th Cir. 2006) (finding that even though the ALJ failed to meet the letter of the good-reason requirement, the ALJ met the goal by indirectly attacking the consistency of the medical opinions). The same is true in the instant case. The Court's duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *Raisor v. Schweiker*, 540 F. Supp. 686 (S.D. Ohio 1982). Substantial evidence supports the ALJ's finding that Plaintiff could perform a limited range of light work and therefore was not disabled. The issue is not whether the record could support a finding of disability, but rather whether the ALJ's decision is supported by substantial evidence. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993).

---

[12] Plaintiff's contention that there were a number of problems with Dr. Rogers' opinions (a non-examining physician) is unsupported by the evidence. Plaintiff claims that Dr. Rogers cited possible substance abuse as the "main reason" Plaintiff's conditions did not meet any listings. However, Dr. Rogers made clear that Plaintiff's symptoms did not meet any listings, and then added that they may also be "substance-induced." (Tr. 641, 50). Although the ALJ noted that the record shows a history of alcohol and drug use and Plaintiff admitted to have last used marijuana and cocaine about one year ago, the ALJ did not find these facts "material" to the case. (Tr. 22). Moreover, there is no requirement that this Court remand the instant case because Dr. Rogers failed to explain why his opinion about the severity of Plaintiff's mental functional limitations differed from Dr. Leisgang's opinion. Even if the ALJ had accepted Dr. Leisgang's opinion *in toto*, there would still be insufficient evidence to support a finding of disability.

**III.**

For the foregoing reasons, Plaintiff's assignments of error are unavailing.  The ALJ's decision is supported by substantial evidence and is affirmed.

**IT IS THEREFORE ORDERED THAT** the decision of the Commissioner, that Rondal Irvin was not entitled to disability insurance benefits is found **SUPPORTED BY SUBSTANTIAL EVIDENCE**, and **AFFIRMED**; and, as no further matters remain pending for the Court's review, this case is **CLOSED**.

Date:  7/3/13                                                              *s/ Timothy S. Black*
                                                                          Timothy S. Black
                                                                          United States District Judge